Argued February 4, reargued June 4, reversed and remanded
October 17, 1963

## EBERLE *v.* BENEDICTINE SISTERS OF MT. ANGEL ET AL

385 P. 2d 765

*Edward L. Clark, Jr.,* and *Cecil H. Quesseth,* Salem, argued the cause for appellant. On the briefs were Goodenough, Clark & Marsh, Salem.

*Asa L. Lewelling,* Salem, argued the cause for respondent Archdiocese of Portland in Oregon. On the brief were Lewelling & Gies, Salem.

*Bruce W. Williams,* Salem, argued the cause for respondent Benedictine Sisters of Mt. Angel. On the brief were Williams & Skopil and Al J. Laue, Salem.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, Goodwin, Denecke and Lusk, Justices.

DENECKE, J.

This is an action for damages against the owners and operators of a private school. The 13-year-old plaintiff-student received a hand injury when he attempted to hold open a door and his hand slipped off the bar, against a glass panel in the door and broke it. The trial court directed a verdict for the defendants.

The accident occurred in 1960 at the front exit doors of St. Paul's School. The exit consists of a double wooden door which opens outward at the center. The doors contain several glass panels with a panic bar running across the middle part of the door, four and one-half inches below the lowest panel of glass. To open the door the panic bar is pushed downward.

The injury occurred when the plaintiff and his classmates were leaving at the end of the day. Plain-

tiff was carrying books in his left hand and was following another student through the left door. According to the plaintiff, the student ahead of him had gone out the door and it was starting to swing back shut. Plaintiff testified he reached out with his right hand to push against the panic bar to halt the swing of the door and reopen it. His hand slipped off the bar, hit the glass panel, broke it and cut his hand.

The defendant Archdiocese owns the school. It is operated by the defendant Benedictine Sisters.

The principal issue concerns the following allegation of negligence:

"3. In failing to install plate glass in the front doors being used by pupils or otherwise properly keeping the glass from breaking in said doors;
* * * ."

The glass panel that was broken was constructed of "double strength" glass, not plate glass.

It is concluded that the trial court was in error in directing a verdict for the defendants.

■ We conclude that there was testimony from which the jury could find that reasonably prudent school administrators would know that double-strength glass door panels were unsafe.

■ The plaintiff has the status of an invitee or business visitor. *Briggs v. John Yeon Co.,* 168 Or 239, 122 P2d 444; 2 Restatement 897, Torts § 332. As such, the defendants owe him a duty of reasonable care in the construction and maintenance of the building. *Gow v. Multnomah Hotel, Inc.,* 191 Or 45, 49, 224 P2d 552, 228 P2d 791.

2 Restatement 939, Torts § 343, Comment a, states the distinction between the duty owed a licensee and business visitor as follows:

"* * * a licensee is entitled to expect noth-

ing more than an honest disclosure of the dangers which are known to the possessor. * * * Such a [business] visitor is entitled to expect that the possessor will take reasonable care to discover the actual condition of the premises and either make them safe or warn him of dangerous conditions. * * *"

Comment f states:

"A possessor who holds his land open to others for his own business purposes, must possess and exercise a knowledge of the dangerous qualities of the place itself and the appliances provided therein, which is not required of his patrons. * * * This is so because the boarding house keeper, even though a man of the same class as his boarders, is required to have a superior knowledge of the dangers incident to the facilities which he furnishes to them."

An architect was called as a witness by plaintiff. He testified he was familiar with school construction in the Willamette Valley since 1952. He stated that the "standard or usage of glass in doors of public buildings, as distinguished from private homes generally in this area" was quarter-inch plate glass. He further testified that quarter-inch plate glass was four times as strong as double-strength glass. He gave the opinion that the minimum safe glass thickness in the St. Paul School doors would be one-quarter-inch plate and this was for safety "from a breakage standpoint."

■ Ordinarily, when there is any testimony that a material is unsafe and not up to the standard used in the community it is a jury question whether or not the persons using such material, as reasonably prudent persons, should know that the material is unsafe. See cases collected in 2 Harper and James, The Law of Torts, 907, § 16.5, and the text at 916.

However, as defendants point out, this general proposition was found inapplicable in *Doherty v. Arcade Hotel,* 170 Or 374, 134 P2d 118. In that case the plaintiff hotel guest attempted to shut off the water in a wash basin and the porcelain handle broke in the plaintiff's hand, cutting him. There was no testimony of the cause of the breaking of this particular porcelain handle. Plumbers called by the plaintiff testified that porcelain handles were unsafe and had a tendency to break. There was testimony that 60 to 70 per cent of the fixtures in the area had metal, as distinguished from porcelain, handles. The statement of the plumber witness was that porcelain handles were not of "standard make * * * [or] in general use in the plumbers' trade." (at 377) This testimony is very similar to that in the present case and this court in the *Doherty* case held there was no evidence of negligence on the hotel operator's part.

However, the court referred to facts in the *Doherty* case which are materially different than those here. At page 380 the court observed: "The testimony of the four plumbing contractors indicates that porcelain handles were in general, if not universal, use until several years ago" and "porcelain handles are [now] in common use." (at 388) "None of the witnesses claimed that porcelain handles which remained in satisfactory condition were replaced with metal handles." (at 381).

At 391 the court summarized: "Hence, the fact that most of the buildings possess metal handles is nothing more than a repetition of the industry's practice as distinguished from the voice of common experience. As we have already pointed out, even the industry had not formed a practice adverse to porcelain handles until a few years before the plaintiff's injury

occurred. Further, the mere fact that metal handles had gained wide favor does not necessarily indicate that those who chose them condemned porcelain handles as unsafe. Price, appearance, availability and the desire for something new may have been the impelling motives."

Here, there is specific testimony that the standard for glass in the doors of public buildings is glass at least four times as strong as that used in the door of St. Paul's School and insertion of this glass is common usage. The reason for this was not price, appearance, etc., but safety.

Apart from the testimony about the respective use of porcelain and metal handles there was evidence in the *Doherty* case that porcelain handles which were apt to break could be identified before they broke. A plumber testified: "If the handle is not checked or cracked, I would say there was no danger to it." (170 Or, supra, at 379) The maids who cleaned the room and used the handle daily observed no defect in it. Neither did the plaintiff who had occupied the room one month and 14 days before the accident. No comparable evidence is present in this case.

The *Doherty* case is not controlling. There was evidence here that defendants were negligent.

◼ The defendant Benedictine Sisters contend that as they are not the owners of the buildings, they are not responsible for the condition of the door panels. The superintendent of schools for the Archdiocese testified that the Benedictine Sisters operated the school for the Archdiocese. He stated that repairs to the physical plant were a joint responsibility of the Archdiocese and the Benedictine Sisters. This evidence makes the responsibility of the Benedictine Sisters a question for the jury.

The other actions of the trial court which plaintiff charges were incorrect are found to be not in error.

Judgment reversed and remanded.

PERRY, J., dissenting.

I am unable to agree with my associates' interpretation of the evidence and the law applicable thereto as set out in the majority opinion.

At the time of the injury plaintiff was 13 years old. He was attending as a student St. Paul's Parochial School located near Silverton, Oregon. The injury occurred when plaintiff, along with other members of his class, was leaving the school building at the end of the school day on March 15, 1960. The school's front exit consisted of a double wooden door which opened outward at the center. The doors contained four glass panels. These panels were four or five inches above the mechanism by which the door was opened. The mechanism by which the door was to be opened was a bar extending across the door, and by exerting pressure in a downward manner, the latch was lifted and the door would open outward. The bar which was hinged so that it always went downward when pressure was applied was described as a panic bar.

Plaintiff testified that he was following another boy who had opened the door; that the door was closing as he reached it; that he reached for the panic bar, which was "more or less" at his "stomach level"; that his hand slipped off of the bar, and in some unexplained way, went upward and through the glass door. There is no evidence that the panic bar was, or ever had been slippery, or that it failed to move downward when pressure was applied.

The majority discuss only the allegation of the complaint that the defendant was negligent in "failing to

install plate glass in the front doors being used by pupils." I therefore assume that they agree with me that there is no evidence to support the plaintiff's other allegations of negligence, such as "maintaining a defective panic bar and latch on said door."

I agree that the plaintiff was at the time of his injury an invitee on the premises owned and operated by the defendants.

Comment f of 2 Restatement of Torts, § 343, page 944, to which reference is made by the majority, has no application whatever to this case. Comment f, as shown by the subject and the example, deals with "Appliances used on land" such as "providing a gas stove to be used in an unventilated bathroom." There is no evidence in this case of any appliance being furnished to the plaintiff for his use that might cause injury. The sole question is whether a door with glass panels used as an integral part of the premises constituted a dangerous condition. Section 343 of the Restatement of Torts, chapter 13 at page 938, is as follows:

"A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he

(a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, *and*

(b) has no reason to believe that they will discover the condition or realize the risk involved therein, *and*

(c) invites or permits them to enter or remain upon the land without exercising reasonable care

(i) to make the condition reasonably safe, or

(ii) to give a warning adequate to enable them to avoid the harm without relin-

quishing any of the services which they are entitled to receive, if the possessor is a public utility." (Emphasis mine.)

This is the rule of law followed in this state as applicable to public places which the public is invited to use. *Gow v. Multnomah Hotel, Inc.*, 191 Or 45, 224 P2d 552, 228 P2d 791. Thus, under the facts of this case, and the pertinent law, the question of fact to be answered is whether or not the defendants knew or should have known that the use of double-strength glass in the type of door built and equipped as it was with a panic bar, upon which force was to be exerted downward, constituted an unreasonable risk of injury to the pupils of the school.

The defendants are not insurers of absolute safety, and are not required to guard against the mere possibility of an accident, but only those hazards which a reasonably prudent person in the position of the defendants could reasonably be required to anticipate from the use of the premises in a proper manner by a pupil. *Waller v. N. P. Terminal Co. of Oregon*, 178 Or 274, 166 P2d 488. That there is no evidence upon this fact is demonstrated by the record in this case. First, there is not an iota of evidence that if the door was used in the manner in which it was intended that it should be used, either in opening, or holding it open, that the glass, whatever its nature, constituted any hazard to any user of the door. Therefore, before it can be said that the use of glass of any nature constituted negligence, it must first be shown *that the manner in which the door was used was known, or should have been known*, to the defendants, as reasonable operators of the school, so that the using of an inferior glass under these circumstances would con-

stitute a hazard to those using the door in such a manner.

There is absolutely no evidence that this door, by custom, or occasional usage, or even once, was opened, or held open, or forced back as it tended to close, by the placing of hands on the glass panels, so as to charge these defendants with knowledge that the use of inferior glass panels might constitute a hazard to school children in thus using the door.

The plaintiff testified that he was attempting to open further the closing door in the proper manner, by exerting force on the panel bar, so there is no issue of imputed knowledge of children's proclivities to depart from adult standards of conduct by applying force to the glass. There is no evidence that the door was so constructed that in attempting to open it, or hold it open, or push it further open, by proper use of the panic bar, there was any danger of coming into contact with the glass panel. It would certainly be necessary to show danger in using the panic bar, with reference to the glass panels as located, or a defective bar, to charge the defendants as reasonably prudent persons with being negligent in using an inferior glass.

The issue of defendants' negligence then must rest upon the proposition, either that the panic bar was so located on the door that the glass panels presented a source of danger to those using the panic bar, or the panic bar was so defective that instead of going downward it remained stationary, and by some means the hand might possibly slip upward. There is no evidence in the record to establish either of these facts. First, the record establishes the panic bar was four or five inches below any glass panels, and second, as previously stated, the plaintiff testified that the panic bar was waist-high; that if pushed downward, the

force then exerted by the hand at that level from the shoulder is downward to a position on the door where there is no glass. This is in accordance with the established law of physics, and no contrary presumption can be engaged in. Therefore, before the nature of the glass could be considered as a competent factor and not just a condition, it was first necessary to establish some fact upon which a jury could find that in the use of the door, a reasonably prudent person would know, or should know, there was danger of contact with the glass in the opening, holding open, or pushing further open, the door by use of the panic bar. However, all of the evidence relied upon by the majority, if it could be considered, this evidence in my opinion goes only to the fact that it is safer, in case of some negligent act, to use plate glass than double-strength glass in school doors.

In my opinion the majority in reversing this case have crossed the bridge before it was built. I therefore dissent.

Mr. Chief Justice McALLISTER and Mr. Justice ROSSMAN join in this dissent.